## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRIENDS OF ANIMALS, a non-profit corporation,<br>777 Post Road, Suite 205<br>Darien, CT 06820<br><br>　　　*Plaintiff*,<br><br>　v.<br><br>DAVID BERNHARDT, in his official capacity as United States Secretary of the Interior;<br>1849 C Street NW<br>Washington, D.C. 20240;<br><br>AURELIA SKIPWITH, in her official capacity as Director, United States Fish & Wildlife Service,<br>1849 C Street NW<br>Washington, D.C. 20240;<br><br>　and<br><br>UNITED STATES FISH & WILDLIFE SERVICE, an agency within the United States Department of the Interior,<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>　　　*Defendants*. | Civ. No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br><br><br><br>September 29, 2020 |

### INTRODUCTION

1.　　Congress passed the Migratory Bird Hunting and Conservation Stamp Act in 1934, providing a permanent source of funds for the Migratory Bird Conservation Fund (hereinafter "the Fund"). The Fund had to be created after excess hunting drove many

1

waterfowl species to the point of extinction. Market shooting, bounty hunting, unregulated sport hunting, and the collection of feathers for the fashion industry all contributed to this terrible loss. In addition, millions of acres of wetlands were destroyed, which greatly reduced waterfowl breeding and nesting habitat. The Fund's purpose was to regulate hunting and preserve essential wetlands and other habitats for waterfowl.

2.      Duck Stamps and the Duck Stamp Contest (hereinafter "Contest") were created as an innovative way to force hunters to pay for the damage they were causing to waterfowl. The Contest remains a unique federal art contest today, and the stamps are sought after and purchased by birders, nature photographers, outdoor enthusiasts, stamp collectors, and art collectors.

3.      Plaintiff, Friends of Animals, files this action on its own behalf and on behalf of its adversely affected members to challenge the Fish & Wildlife Service's (FWS) New Rule that will reduce the revenue available for wildlife conservation and will severely undermine FWS's own policies underlying their annual art competition to create a Duck Stamp for the generation of conservation funds.  The Contest allows artists across the country to submit their artwork, and the winning design is featured on the Duck Stamp for that year. Specifically, Friends of Animals challenges (1) the Revision of Federal Migratory Bird Hunting and Conservation Stamp (Duck Stamp) Contest Regulations (hereinafter "New Rule"), (2) the failure of FWS to respond to substantive comments made on the proposed New Rule, and (3) the failure of FWS to perform an environmental assessment before promulgating the rule.

4.      All proceeds from the sales of Duck Stamps go directly into the Migratory Bird Conservation Fund.

2

5.      The Duck Stamp program has only provided funds to acquire about three percent of National Wildlife Refuge System lands. The overwhelming majority of the lands are acquired from general taxpayer sources.

6.      The practice of hunting peaked in the United States almost forty years ago, and now less than four percent of the population hunts. Waterfowl hunters make up even less of the population, with not even one percent of Americans hunting waterfowl. This has led to fewer hunters purchasing Duck Stamps.

7.      Hunters are required to purchase a Duck Stamp annually if they wish to shoot waterfowl in the United States during the time period covered by that Duck Stamp.

8.      Not every duck hunter hunts waterfowl every year. It is estimated that only a third of the duck hunter population purchases a Duck Stamp every year.

9.      FWS itself has found that birders, wildlife photographers, and other non-hunting wildlife participants voluntarily purchase stamps, and their contributions are essential for generating monies to fund habit protection and conservation efforts. A page on FWS's website gives Duck Stamp information for birders and photographers, with one heading referring to the Duck Stamp program as "Not Just for Ducks or Hunters."

10.      The success of the Federal Duck Stamp program in generating revenue for the Fund has been credited to the fact that anyone, not just hunters, can buy a stamp, as well as the ability to use the stamp as a pass to enter national wildlife refuges without paying the usual entrance fees. The Duck Stamp program cannot survive on only the funds from waterfowl hunters.

11.     FWS's New Rule requires that every Contest submission incorporate "an appropriate waterfowl hunting scene and/or accessory."

12.     The Federal Duck Stamp Task Force and Wildlife Management Institute have both expressed the need to engage with additional parties interested in conservation other than hunters. Since hunting is on the decline, these parties need to be involved to acquire the funds required for adequate land conservation. The New Rule promulgated by FWS directly contradicts this idea by implying that only hunters should and have purchased Duck Stamps.

13.     The New Rule will alienate a large source of stamp buyers and conservation supporters, who will continue to greatly outnumber the hunting population, by making the iconic symbol of the Duck Stamp a permanent reminder of, and advocate for, waterfowl hunting.

14.     A failure to develop a proper relationship with non-hunters may also cause parties who do not partake in hunting activities to mistrust FWS, and may subsequently cause a lack of support for funding more generally.

15.     Although the amount of waterfowl hunting is decreasing in the United States, climate change continues to threaten bird populations in North America, particularly by jeopardizing their wetland habitats. Wetlands perform many essential functions besides their role as a home for waterfowl, such as maintaining ground water, filtering pollutants, protecting shorelines, and storing flood waters.

16.     In light of these modern problems, conservation funds are as important as ever and will continue to require increased funding. FWS needs to acknowledge that fact in its rulemakings.

17.     Conservation funds need more money, hunting is severely declining in the United States, and overall participation in the Duck Stamp program peaked fifty years ago. FWS should be finding ways to reach out to new audiences, instead of nonsensically doubling down on an interest group that has already maxed out its participation in the program.

18.     The New Rule not only arbitrarily jeopardizes revenue for the Fund against the purposes of the Duck Stamp Act and alienates non-hunters from the Duck Stamp program, but also violates several federal laws.

19.     First, the New Rule mandating that all Duck Stamp designs include a waterfowl hunting scene or accessory violates the Administrative Procedure Act (APA). This rulemaking is an arbitrary and capricious agency action, due to the agency's failure to consider how this action will reduce funds for wildlife conservation and the agency's failure to consider reasonable alternatives to implementing this rule.

20.     Second, FWS violated the APA by failing to adequately respond to several categories of substantive comments that were made on the proposed New Rule, and by failing to address the fact that roughly 85% of comments received were against the proposed New Rule.

21.     Third, FWS violated the National Environmental Policy Act (NEPA) by failing to take a "hard look" at the potential environmental consequences of the New Rule.

22.     Finally, the potential environmental effects of incorporating hunting into the Duck Stamp, an invaluable source of funding for wildlife refuges and the conservation of wetlands, were not analyzed in an environmental assessment (hereinafter "EA"). It is therefore unknown what environmental impacts this New Rule may have. An EA needs to be conducted to determine whether the New Rule would reduce revenue for the

Fund, and what effect that reduction would have on land conservation. FWS should include the need for the rule change, possible alternatives, environmental impacts of the rule, and a listing of consulted parties in the EA.

23.    For these reasons, and as further alleged below, Friends of Animals seeks a declaration from this Court that Defendants violated the APA and NEPA. Friends of Animals requests that the Court vacate and remand the New Rule to FWS.

## PARTIES

24.    Friends of Animals is a nonprofit, international animal advocacy organization, incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide. Friends of Animals has its headquarters in Darien, Connecticut.

25.    Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals is committed to protecting animals endangered by poaching, hunting, and other means of animal exploitation through a variety of advocacy programs. Friends of Animals keeps its members informed of animal advocacy issues by addressing them through its magazine, *ActionLine,* its website, social media, and public events. Friends of Animals regularly advocates for the rights of waterfowl to live freely on public lands and conserve enough land as necessary for them to live comfortably.

26.    Defendants' failure to comply with the APA and NEPA injures Friends of Animals' members. Friends of Animals has members who buy Duck Stamps to support conservation. Some of Friends of Animals' members will not purchase future stamps if they feature hunting imagery. Friends of Animals' members will be harmed because

they want to support conservation, help finance the Duck Stamp program, enjoy the artwork, and collect stamps, but they do not support or agree with recreational hunting of waterfowl. Friends of Animals and its members are also harmed because of their inability to participate in a full NEPA analysis.

27.     Defendant Aurelia Skipwith is sued in her official capacity as the Director of United States Fish & Wildlife Service. Ms. Skipwith is responsible for all FWS actions.

28.     Defendant David Bernhardt is sued in his official capacity as Secretary of the Interior. As Secretary, Mr. Bernhardt oversees all agencies within the Department of the Interior, including FWS.

29.     Defendant United States Fish & Wildlife Service is an agency within the Department of the Interior. It is the federal agency in charge of the regulation and conservation of wildlife and is responsible for ensuring that its actions comply with the requirements of federal law.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (APA). This action presents a case and controversy arising under federal statutes, namely NEPA and the APA.

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff resides in this district and no real property is involved in this action.

32.     This Court has authority to grant Plaintiff's requested relief under 5 U.S.C. §§ 701-706 for the APA claims.

## STATUTORY BACKGROUND

### A.  Migratory Bird Conservation Act

33.    Congress passed the Migratory Bird Conservation Act (hereinafter "MBCA")
in 1929 because hunters were decimating waterfowl populations, and funds were
needed to both purchase wetlands as waterfowl habitat and to protect the wetlands
themselves.

34.    The MBCA created a Migratory Bird Conservation Commission that was
charged with approving land and water areas recommended by the Secretary of the
Interior to be acquired with monies from the Fund. 16 U.S.C. § 715a. The Commission
can also establish new waterfowl refuges.

35.    Under the MBCA, the Secretary of the Interior may not recommend
purchasing or renting any land unless they have determined the area is necessary for
the conservation of migratory birds. 16 U.S.C. § 715c. The Secretary of the Interior can
purchase, rent, or acquire any land "which he deems to be suitable for use as an
inviolate sanctuary, or for any other management purpose, for migratory birds." 16
U.S.C. § 715d.

36.    The clear purpose of the MBCA was to protect migratory birds and their
habitats, as shown in the title of the MBCA, its mandates governing the approval of land,
and its provisions for funds to be appropriated to conserve waterfowl and other
migratory birds.

### B.  Migratory Bird Hunting and Conservation Stamp Act (Duck Stamp Act)

37.    The Duck Stamp Act holds that no individual over the age of sixteen shall
take any migratory waterfowl unless they have properly purchased a Duck Stamp. 16
U.S.C. § 718a.

8

38.     The Duck Stamp Act was created to provide a permanent source of money for the Fund and wildlife conservation. 16 U.S.C. § 718b(a)(2). Ninety-eight cents of every Duck Stamp dollar go directly into the Fund to purchase wetlands and other habitats for the National Wildlife Refuge System.

39.     It is required that all funds from stamps sold under the Duck Stamp Act be "reserved and set aside as a special fund, to be known as the 'Migratory Bird Conservation Fund,'" and shall be available for "the location, ascertainment, and acquisition of suitable areas for migratory bird refuges under the provisions of the Migratory Bird Conservation Act." 16 U.S.C. § 718d(a)(3), (b)(2).

40.     Only some of the lands obtained through the Fund are open to hunting.

41.     The Duck Stamp Act was amended in 1984 to allow reproductions of the federal Duck Stamp on products created by private sector enterprises. Profits from these enterprises are also deposited into the Fund. 16 U.S.C. § 718e(c).

42.     The Secretary can adjust current policies to make up for a reduction of revenues deposited into the Fund for the previous year. 16 U.S.C. § 718b(c).

## C.  The National Environmental Policy Act (NEPA)

43.     NEPA, 42 U.S.C. § 4321 *et seq.*, is the basic charter for environmental protection in the United States. 40 C.F.R. § 1500.1(a).

44.     NEPA was enacted by Congress for two purposes: to ensure that all federal agencies examine and account for the environmental impacts of their actions before acting, and to provide the public with a means to be informed and comment on the potential environmental impacts of proposed agency actions. *Id.* at § 1500.1. NEPA ensures that agencies will analyze the environmental impacts of any federal action they plan to undertake. 42 U.S.C. § 4332(2)(C).

45.     An agency must consider "connected actions," "similar actions," and "cumulative actions" in addition to its proposed action when determining the necessary scope of its NEPA analysis. 40 C.F.R. § 1508.25(a).

46.     An environmental impact statement (hereinafter "EIS") must be prepared if an action may "significantly affect the quality of the human environment." An EIS must discuss the environmental impact of a proposed action, adverse environmental effects that cannot be avoided if the proposal is implemented, and any alternatives to the proposed action. 42 U.S.C. § 4332(2)(C).

47.     An EA is a "concise public document . . . that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and "aid an agency's compliance with the Act when no environmental impact statement is necessary." 40 C.F.R. § 1508.9.

48.     An EA allows an agency to determine whether a proposed action requires preparation of an EIS or results in a finding of no significant impact.

49.     An EA requires that an agency take a "hard look" at the potential consequences of its actions and provide adequate analysis and evidence to support a determination of whether to prepare an EIS. 40 C.F.R. § 1501.4(b).

50.     Agencies are required to involve the public in the process of preparing an EA. 40 C.F.R. § 1501.4(b).

51.     If the impacts are determined to be insignificant by the agency, it must supply its reasoning and make its findings available to the public. 40 C.F.R. § 1501.4(e).

52.     The FWS NEPA Reference Handbook holds that the agency must prepare an EA if the proposed action does not fall under a categorical exclusion or require an EIS,

or when "the impacts of the action are uncertain, or when there are unresolved environmental issues."

53.     The FWS NEPA Reference Handbook states that scoping should be used to design an EA. The objective of scoping is "to identify significant issues and to translate these into the purpose for the action, the needs for the action, the action or actions to be taken, alternatives to be considered in detail, alternatives not to be considered in detail, and impacts to be addressed."

54.     A significant effect may still be present even if the federal agency believes the ultimate effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

**D.  The Administrative Procedure Act (APA)**

55.     The APA governs the procedures of federal administrative agencies and defines an agency as "each authority of the Government of the Unites States," unless expressly excluded from the Act. 5 U.S.C. §§ 551-559.

56.     FWS is not expressly excluded from the APA.

57.     The APA holds that the reviewing court shall hold unlawful any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

58.     An agency action is arbitrary and capricious if the agency offers an explanation for the decision that is contrary to the evidence before it, acts so implausibly that it cannot be ascribed to a difference in view or agency expertise, fails to consider an important aspect of the problem, or relies on factors which Congress had not intended it to consider.

59.      The APA requires an agency to respond to comments of material importance.

## FACTUAL ALLEGATIONS

### A.  The Plight of Waterfowl

60.      In 1900, 150 million migratory waterfowl lived in North America. When hunting began to increase in the United States, it resulted in there being less than 30 million wild ducks in North America by the year 1934. Overhunting depleted species such as wood ducks, mallards, and ring-necked ducks to the point where federal action was essential to their continued existence.

61.      Waterfowl habitats were decimated at the same time the overhunting began. Forests and inland wetlands were harvested and drained to give way to agriculture and houses. The ecological importance of these lands made this an environmental issue, in addition to putting waterfowl species in even more danger by taking away their habitats and food sources.

62.      Waterfowl have only recovered to acceptable species levels by implementing the National Wildlife Refuge System that serves as a home to waterfowl.

63.      By the time the Duck Stamp Act was enacted in 1934, waterfowl populations had fallen to an estimated 27 million birds, which was an all-time low for the North American continent.

64.      The Duck Stamp Act played a large role in recovering waterfowl from their decimation by hunters through its use of an art contest that soon grew to national prestige in the United States.

### B.  The Duck Stamp Contest

65.      The Migratory Bird Hunting and Conservation Stamp Act was created to generate revenue for wildlife conservation through the sale of Duck Stamps.



Photograph of the first Duck Stamp selected from the Duck Stamp Contest (FWS)

66.     The ultimate purpose of the Duck Stamp Act is to finance the preservation of wetlands by imposing fees on hunters, who cause an increased need for conservation by killing waterfowl.

67.     The original name of "Migratory Bird Hunting Stamp Act" was changed in 1976 to "The Migratory Bird Hunting and Conservation Stamp Act" to further emphasize the conservation purposes of the Act.

68.     This name change was also meant to broaden the appeal of the Duck Stamp to increase revenue.

69.     The Duck Stamp Contest occurs annually to determine what the Duck Stamp will look like for that year. The Contest is open to all U.S. citizens over the age of eighteen.

70.     The Contest is governed by the regulations in 50 C.F.R. § 91 *et seq*., and any changes to these regulations must be completed through a formal rulemaking process.

71.     Each year, competitors must choose from one of the five selected waterfowl species to be the dominant feature of their submission.

72.     The winner is selected each year by a panel of noted art, waterfowl, and stamp authorities.

73.     Only two winning stamps in the past eighty-four years of the Contest voluntarily included a hunting element. The 1975-1976 Duck Stamp featured a painted duck decoy, and the 1999-2000 stamp featured a hunter and dog in a boat.

74.     The 1959-1960 Duck Stamp had a mandatory hunting theme of "Retrievers save game."

75.     In the 2018-2019 Contest, FWS forced artists to include a hunting element, as the New Rule now requires. Numerous artists dropped out of the contest in protest. The subsequent Contest in 2019-2020 did not force artists to include any hunting elements.

**C.   The Duck Stamp and the Migratory Bird Conservation Fund**

76.     The Duck Stamp Act was passed by Congress to provide a permanent source of money for the Fund. The contributions to the Fund from Duck Stamp purchases are an important source of revenue for the National Wildlife Refuge System.

77.     A Duck Stamp currently costs twenty-five dollars for a yearlong license to hunt waterfowl. FWS increased the price to twenty-five dollars in 2015.

78.     Any person who wishes to hunt waterfowl in the United States must purchase a Duck Stamp annually and carry it with their general hunting license.

79.     Other individuals, such as birders, wildlife photographers, conservationists, stamp collectors, and artists, purchase the duck stamps to promote conservation efforts.

14

80.     Purchasing a Duck Stamp allows the buyer to gain access to National Wildlife Refuges that otherwise require payment to enter.

81.     The initial reaction of non-hunters to purchasing Duck Stamps is often negative because of its association with hunting, but non-hunters are still encouraged to purchase the stamps by organizations that explain the conservation purposes behind the Duck Stamps.

82.     FWS estimates that ten percent of Duck Stamp revenues currently come from non-hunters.

83.     The Duck Stamp program provides for the purchase of about three percent of National Wildlife Refuge System lands. Most other funds come from general taxpayer sources.

84.     Current funding levels for national wildlife conservation are less than five percent of what is necessary to continue to carry out invaluable land preservation efforts.

85.     FWS has indicated dramatic increases in the total costs of conservation, which results in a need for increased revenue from Duck Stamp sales. However, the program's revenue has declined and is currently insufficient to meet conservation goals.

**D.  The Decline of the Duck Stamp and Hunting**

86.     FWS has indicated that one of its goal is to identify new uses for the Duck Stamp, such as non-hunting and recreational activities, due to the continuing decrease in waterfowl hunters.

87.     Hunting in general is on a steep decline in the U.S., with not even one million Americans hunting waterfowl in 2015, which is less than half of the over two million

that hunted waterfowl in 1970. Non-violent activities such as birding are on the rise, indicated by the forty-six million people in the United States who birdwatch.

88.    FWS estimates that only four percent of Americans are hunters, which is approximately half of what it was fifty years ago. This decrease in hunters is expected to accelerate in the future.

89.    Wildlife watching has increased by twenty percent from 2011 to 2016, and expenditures by wildlife watchers rose sharply from $59.1 billion to $75.9 billion. Expenditures by hunters during the same time period decreased from $36.3 billion to $25.6 billion.

90.    The National Wildlife Refuge System hosted more than 50.2 million visitors in 2016, and only 2.43 million of these visitors came to hunt.

91.    Sales of the duck stamp have decreased from 2,412,651 units sold in 1971-1972 to only 1,518,690 units sold in 2017-2018.

92.    Unit sales of stamps have declined because fewer people are hunting, therefore fewer hunters exist to purchase stamps. Dollar revenue has only been saved from decline because stamp prices have increased several times.

93.    Since hunters are required to purchase a Duck Stamp in order to hunt, attempting to further appeal to them will not raise additional Duck Stamp revenue. Hunters have maxed out their participation in the program.

**E.  New Rule and Agency Response to Comments**

94.    In 2020, FWS implemented the New Rule, which permanently requires every Duck Stamp submission to incorporate a theme of "celebrating our waterfowl hunting heritage," and therefore include "an appropriate waterfowl hunting scene and/or accessory" in every Contest submission.

95.     The stated purpose of the New Rule is to "recognize the role of hunters, the primary purchasers of Duck Stamps, in raising over $1.1 billion for waterfowl habitat conservation through the sale of Duck Stamps."

96.     There is no discussion in the regulations governing the Contest or in the Duck Stamp Act to indicate that the Stamp's design should be tailored to any group of people.

97.     FWS received 716 comments on the proposed New Rule. Roughly 600 of those comments opposed the New Rule. Fewer than 100 comments supported the New Rule. In fact, the number of commenters who hunted or supported hunting and **still** opposed the rule (104) was greater than the total number of comments supporting the New Rule (98).

98.     Stunningly, FWS declared in the final rule that "[m]ost commenters applauded the huge financial commitment hunters annually put toward wildlife conservation." This falsehood attempts to downplay the overwhelmingly negative response from public comments.

99.     Far fewer than half of the comments submitted applauded any alleged commitment towards conservation. FWS's statement counts comments from more than 100 hunters or people who support hunting as having "applauded the huge financial commitment," but fails to mention that these commenters **opposed** the New Rule.

100.    In response to comments raising concerns that this rule would jeopardize the Stamp's appeal to nonhunters, FWS stated that the New Rule would "recognize the contributions of hunters and hunting to waterfowl and wetland conservation." Revision of Federal Migratory Bird Hunting and Conservation Stamp (Duck Stamp) Contest Regulations, 85 Fed. Reg. 27,314 (May 8, 2020) (to be codified at 50 C.F.R. Part 91).

101.    In response to comments raising concerns that the new hunting theme would alienate non-consumptive buyers and jeopardize funding for the National Wildlife Refuge System, FWS stated that it will "continue to encourage non-consumptive wildlife resource users, stamp collectors, and other conservationists to purchase Federal Duck Stamps," and that they "hope that current non-consumptive purchasers . . . will continue to support conservation afforded by Stamp sales." *Id.* at 27,315.

102.    In response to comments raising concerns that stamp collecting purchases would decrease and the theme would restrict print sales, FWS stated that winning artwork will be not be radically different from historical stamps, even though only four designs total in the past eighty-four years contained a hunting element, two of which mandated that artists include a hunting element for that year. *Id.* at 27,316.

103.    In response to comments raising concerns that non-hunters did not feel their contributions were being acknowledged and that FWS should encourage non-hunters to purchase stamps, FWS stated that the name of the Duck Stamp Act had been changed to the "Migratory Bird Hunting and Conservation Stamp . . . to reflect the broader conservation aspects and primary goal of the Stamp. While the theme and inclusion of a hunting-related accessory and/or scene will be mandatory . . . the central focal point and dominant aspect of each entry will still be the portrayal of at least one of that year's five eligible waterfowl species." *Id.* at 27,315.

104.    No changes to the final rule were made in response to any of the comments received in response to the proposed New Rule.

18

## FIRST CAUSE OF ACTION

## (VIOLATION OF THE APA – AGENCY ACTION WAS ARBITRARY AND CAPRICIOUS)

105.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

106.    On the above facts and legal obligations, Defendants violated the APA through their arbitrary and capricious agency action.

107.    First, section 718b(c) of the Duck Stamp Act allows FWS to change the stamp price if the current stamp price has reduced revenues being deposited into the Fund. FWS's decision to implement the New Rule without considering the impact it may have on revenues being deposited into the Fund is therefore contrary to governing law and is arbitrary and capricious.

108.    FWS failed to consider important aspects of the New Rule by ignoring the decrease in hunting in the United States, by ignoring the need to appeal to non-hunters in order to maintain conservation funds, and by ignoring the purpose of the Duck Stamp to increase revenue for conservation, all of which result in this action being arbitrary and capricious.

109.    FWS acted contrary to the evidence before it when it decided to require a hunting element in all Duck Stamps, despite the decrease in hunters in the U.S., the decrease in hunters purchasing the stamps, and the relatively small amount of revenue from hunters purchasing Duck Stamps that actually contributes to conservation efforts.

110.    In issuing the New Rule, Defendants violated the APA by failing to properly respond to substantive comments received on the proposed New Rule.

19

111.    FWS failed to respond to the substance of comments that raised concerns about the Stamp's lessened appeal to non-hunters, a decrease in revenue due to the alienation of non-hunters, and a decrease in Contest entry and stamp collecting.

112.    In issuing the New Rule, Defendants failed to comply with the notice and comment rulemaking requirements of the APA. 5 U.S.C. § 553.

113.    On the above facts and legal obligations, Defendants changed the rules for the Contest regulations without providing an adequate, reasoned explanation.

114.    In issuing the New Rule, Defendants abruptly changed previous contest regulations that never contained a permanent, mandatory theme of any type for all contest entries.

115.    Defendants failed to explain why the mandatory theme is necessary or helpful to the purposes of the Contest.

116.    In issuing the New Rule and failing to consider an important aspect of the problem, deciding against the evidence before the agency, and acting contrary to governing law, as well as failing to respond to substantive comments or provide a reasoned explanation for the rule change, Defendants' actions are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, or without the observance of procedure required by law. As such, the New Rule should be set aside under the APA. 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (VIOLATION OF NEPA - FAILURE TO CONDUCT AN ENVIRONMENTAL ASSESMENT, TAKE A HARD LOOK AT THE PROPOSED ACTION, OR CONSIDER REASONABLE ALTERNATIVES)

117.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

118.    On the above facts and legal obligations, Defendants violated NEPA by failing to consider a reasonable range of alternatives, including implementing differing themes for every year, implementing a theme that appeals to a larger range of those who purchase the Duck stamp, and implementing multiple themes for competitors to choose from.

119.    Defendants failed to provide any discussion of the potential environmental impacts of the New Rule.

120.    On the above facts and legal obligations, Defendants violated NEPA because they failed to take a hard look at the proposed action by not independently and adequately analyzing the direct, indirect, cumulative, and site-specific effects of implementing a rule that will jeopardize the funding available for habitat and land conservation.

121.    The Defendants did not prepare an EA before issuing this New Rule to determine if an EIS would be required or whether there would be a significant impact. They did not provide a convincing statement of reasons for why the impacts would be insignificant enough to not require an EA.

122.    The implementation of a mandatory and permanent requirement that the Duck Stamp contain hunting imagery on every design will result in a decrease in artist participation and a decrease in non-hunters' purchase of the stamps. This will cause a decrease in Duck Stamp revenue that will impact the amount of lands that can be conserved for waterfowl habitat.

123.    In issuing this New Rule without considering a reasonable range of alternatives, without conducting a complete and independent analysis of the direct, indirect, cumulative, and site specific impacts of the proposed action and alternative

actions, and without presenting an EA or convincing statement of reasons for not

completing an EA, Defendants' actions are arbitrary and capricious, an abuse of

discretion, and not in accordance with law or required procedure, in violation of the

APA. 5 U.S.C. § 706.

### REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing

the following relief:

A.   Declare that Defendants' new Contest regulations violated NEPA, and that FWS acted arbitrarily and capriciously in not determining the potential environmental effects of loss of funding on wetlands and National Wildlife Refuges;

B.   Declare that Defendants' New Rule and lack of EA to investigate the impacts of the New Rule violated NEPA and its implementing rules and regulations;

C.   Declare that Defendants violated the APA by failing to adequately respond to substantive comments received on the proposed New Rule;

D.   Vacate and remand the New Rule back to FWS;

E.   Award Plaintiff its reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.,* and/or all other applicable authorities; and/or

F.   Grant such further relief as the Court deems just and equitable.


Dated: September 29, 2020                Respectfully Submitted,

                                         */s/ Jessica Rubin*
                                         Jessica Rubin (Bar No. Ct13768)
                                         Director of Legal Practice and Animal Law Clinic
                                         University of Connecticut School of Law
                                         55 Elizabeth Street
                                         Hartford, CT 06105
                                         Tel: (860) 570-5209
                                         Jessica.rubin@uconn.edu

/s/ Stephen Hernick
Stephen Hernick (*pro hac vice* pending)
Friends of Animals Wildlife Law Program
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: (720) 949-7791
Fax: 888-236-3303
shernick@friendsofanimals.org